UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


| | | |
|---|---|---|
| EVELYN D. SHAULIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:12CV1571 TIA |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

This cause is on appeal from an adverse ruling of the Social Security Administration.  The

suit involves Applications for Disability Insurance Benefits under Title II of the Social Security

Act and for Supplemental Security Income under Title XVI of the Act.  Claimant has filed a Brief

in Support of her Complaint, and the Commissioner has filed a Brief in Support of her Answer.

The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## I.      Procedural History

On January 22, 2009, Claimant Evelyn D. Shaulis filed Applications for Disability

Insurance Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 157-74) and for

Supplemental Security Income payments pursuant to Title XVI of the Social Security Act, 42

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is therefore substituted for Michael J. Astrue as the Defendant in this action.

U.S.C. §§ 1381, et. seq. (Tr. 154-56).[2]  Claimant states that her disability began on February 14, 2007,[3] as a result of asthma, irritable bowel syndrome, anxiety, depression, neck and back injury, stomach, and migraines. (Tr. 179).  On initial consideration, the Social Security Administration denied Claimant's claims for benefits. (Tr. 84-88).  Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 89-93).  On June 9, 2010, a hearing was held before an ALJ. (Tr. 28-73).  Claimant testified and was represented by counsel. (Id.).  Vocational Expert J. Stephen Dolan  also testified at the hearing. (Tr. 47-50, 150-53).  Thereafter, on September 9, 2010, the ALJ issued a decision denying Claimant's claims for benefits. (Tr. 8-18).   After considering the letter from counsel and additional medical records from Drs. David Lipsitz and Ana Maria Soto provided by counsel, the Appeals Council on January 4, 2012 found no basis for changing the ALJ's decision.  Further, on June 27, 2012, the Appeals Council found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision. (Tr. 1-6).  The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.    Evidence Before the ALJ

### A.  Hearing on June 9, 2010

#### 1.  Claimant's Testimony

At the hearing on June 9, 2010, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 30-47).  Claimant is forty-eight years old and completed high

---

[2]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer (Docket No. 12/filed November 1, 2012).

[3]Although Claimant originally alleged an onset date of December 31, 2005 in her applications, at the hearing, she amended her onset date to December 1, 2007. (Tr. 9, 18,102, 109, 125).

school.  (Tr. 30).  Claimant stands at five feet seven inches and weighs 175 pounds.  (Tr. 33). Claimant lives with her mother in a mobile home.  (Tr. 41).

Claimant worked for Comcast from 1984 through July, 2001 as a customer service representative.  (Tr. 31).   Claimant next worked at AGE for three months and then at Dillards from 2005 to February 14, 2007 in the women's department as a sales person.  (Tr. 31-32). Claimant left the job because of her illness.  (Tr. 32).  Claimant worked in temporary service jobs for a couple of months starting in November 2007 and for Verizon starting in November 2009 through January 2010.  (Tr. 33-34).

Claimant has irritable bowel syndrome, diverticulosis, pancreatitis, and asthma.  (Tr. 35-36).  Although Claimant testified that she has psychological problems, she has not received any type of psychiatric treatment since her alleged onset date due to lack of finances.  (Tr. 36). Claimant admitted that she had not sought treatment as an indigent or clinic, because of her stress and anxiety, and she does not like to hear about other people's problems.  (Tr. 36-37).  Claimant testified that she has a headache every day, but she lacks resources to fill her medications.  (Tr. 37).   Claimant experiences dizziness, fainting episodes, chest pains, and shortness of breath.  (Tr. 38).  Claimant testified that she has severe pain in her hip, back, legs, neck, and head.  (Tr. 39). Claimant takes pain medication when she has the money for the medicine.  (Tr. 39).  Claimant experiences nausea every day caused by anxiety or medications.  (Tr. 40).

Claimant sought medical treatment in the emergency room three times in the last week, for leg swelling, dehydration, and exhaustion.  (Tr. 40).

Claimant can dress and shower without assistance.  (Tr. 42).  Depending upon the day, she can vacuum, dust, and cook because some days are better than other days.  Claimant can

drive, but she prefers not to drive because of her dizziness and headaches. (Tr. 42). Claimant

testified that she cannot sit or stand for more than five minutes. (Tr. 43). Claimant walks with a

limp. Claimant testified that she needs to lie down most of the day because of dizziness and

headaches. (Tr. 43). Claimant has problems sleeping at night and experiences flashbacks from

her childhood. (Tr. 44, 46). Claimant has crying spells and panic attacks. (Tr. 46).

### 2. Testimony of Vocational Expert

Vocational Expert J. Stephen Dolan testified in response to the ALJ's questions. (Tr. 47-

50). The ALJ asked Mr. Dolan to assume that

> a hypothetical claimant age 44 with the alleged date of onset with 12 years of
> education, same past work experience. It's been opined this hypothetical claimant
> is able to lift and carry twenty pounds occasionally, ten pounds frequently, stand or
> walk for six hours out of eight, sit for six, can occasionally climb stairs or ramps,
> never ropes, ladders or scaffolds, occasionally stoop, kneel, crouch, and crawl,
> should avoid concentrated exposure to fumes, odors, dust and gases and the
> hazards of unprotected heights. Given those restrictions and those alone, could
> this hypothetical claimant return to any past relevant work?

(Tr. 47). Mr. Dolan responded that the claimant could work as a customer service representative

inasmuch as the job is sedentary and a clean environment and a women's clothing sales person, a

semi skilled, light job and also a clean environment. (Tr. 47).

The ALJ then added that the claimant is "able to understand, remember and carry out

simple to moderately complex instructions and tasks, could adapt to routine work changes, could

take appropriate precautions to avoid hazards but should not work in a setting which includes

constant or regular contact with the general public." (Tr. 47-48). Mr. Dolan responded that the

hypothetical claimant could not perform the customer service representative and women's

clothing sales person jobs. (Tr. 48). Mr. Dolan noted that such claimant could perform light jobs

such as housekeeping cleaners with 8,000 jobs available in the St. Louis metropolitan area and hand packaging jobs, light exertional level, with 2,000 jobs available. (Tr. 48).

Next, the ALJ asked Mr. Dolan to further assume lifting ten pounds occasionally and less than ten pounds frequently, would the claimant be able to return to any past relevant work? (Tr. 48). Mr. Dolan opined such further restrictions would not preclude the performance of the customer service representative job but would preclude the performance of the women's clothing sales person job. The ALJ next asked if he added psychological conditions what sedentary work could the claimant perform. Mr. Dolan indicated such jobs would include assemblers, unskilled sedentary jobs with 2,000 available in the St. Louis area and product checkers, unskilled sedentary jobs with 200 available in the St. Louis area. (Tr. 49).

Claimant's counsel asked Mr. Dolan to consider if a hypothetical individual with the following abilities be able to sustain full time employment at any job:

> an individual of the claimant's age at onset is unable – has poor to no ability to follow work rules, relate to coworkers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, maintain attention and concentration, and demonstrate reliability....

(Tr. 50). Mr. Dolan responded such individual could not sustain full time employment at any job. (Tr. 50).

### 3. Forms Completed by Claimant

In the Disability Report - Adult, Claimant reported she stopped working on November 30, 2007 because of her condition. (Tr. 179).

In the Function Report - Adult, Claimant noted her daily activities to include watching television, making breakfast, doing the dishes, light cleaning, some laundry, walking the dog, and

cooking lunch and dinner. (Tr. 192, 194). Claimant reported helping take care of the family pets. (Tr. 193). Claimant reported using a walker prescribed to her by a doctor at St. Joseph Hospital in 2008 and using the walker on days she is dizzy. (Tr. 199).

In the Function Report Adult - Third Party, Debra Cook, a friend of Claimant's, noted that Claimant helps take care of a dog and a cat, prepares her own meals, and helps clean and wash the dishes. (Tr. 211-12).

## III.  Medical Records

On April 4, 2006, Claimant received treatment for a runny nose, chest pain, and fever. (Tr. 278).

Claimant reported having sinus problems, congestion, and sore throat on May 8, 2006. (Tr. 269). The doctor directed Claimant to increase her fluids and vaporize and to use Robitussin and to return in three days if not feeling better. (Tr. 275).

On May 23, 2006, Claimant received treatment at St. John's Urgent Care Centers complaining of sinus pressure, congestion, and chest pain. (Tr. 262). Claimant reported lots of mold at work exacerbating her symptoms. (Tr. 262).

On August 4, 2006, Claimant reported having congestion, ear pain, and a sore throat. (Tr. 244). Two days later, she received treatment at St. John's Urgent Care Center for a headache, cold, and cough. (Tr. 253). Although Claimant had been given a prescription for Amoxicillin, she did not get it filled and requested a work excuse. The doctor prescribed Amoxicillin as treatment. (Tr. 253, 258).

On October 20, 2006, Claimant was admitted to St. Joseph Hospital West for treatment of abdominal and chest pain. (Tr. 594). Dr. Moore prescribed Prilosec and Prozac. (Tr. 594).

The Volunteers In Medicine/Family Practice ("VIM") treatment note of October 18, 2006 shows Claimant received treatment for back pain. (Tr. 792).

On November 18, 2006, Claimant received treatment at St. John's Urgent Care Center for nausea and lower back pain. (Tr. 235).

On November 18, 2006, Claimant was admitted to St. Joseph Hospital via the emergency room for treatment of abdominal pain. (Tr. 579). In the discharge diagnosis, Dr. Varga noted that Claimant reported abdominal pain. (Tr. 580). Claimant did not have a primary care physician at that time. A colonoscopy failed to find any abnormalities in that area. Dr. Varga opined that Claimant's abdominal pain and vomiting most likely had been gastroenteritis or possibly irritable bowel syndrome. Dr. Vagra recommended psychiatric evaluation inasmuch as Claimant became tearful and seemed emotionally unstable. Claimant fell during the hospitalization and hit her back and the x-ray showed no fracture. Dr. Vagra ordered Claimant to continue using her inhaler for her asthma. Dr. Vagra did not start Claimant on medications, because he wanted Claimant to find another doctor who she will seek follow-up treatment. (Tr. 580). Dr. Vagra ruled out colitis and inflammatory bowel disease. (Tr. 582). Dr. Vagra noted that Claimant needs to find a primary care physician. (Tr. 582).

During a consultation, Dr. Matthew Nissing noted in the past medical history as follows: "significant for asthma, hysterectomy, and cholecystectomy. She also has an extensive history and notes documenting possible somatization disorder, Munchausen syndrome, anxiety, and depression." (Tr. 583). In the review systems, Dr. Nissing noted "[d]ifficult to accurately assess as virtually any question brings out a positive symptom." (Tr. 583). Dr. Nissing noted her physical examination to be benign, and laboratory tests to all be normal and opined Claimant most

likely has irritable bowel syndrome with an overlay of psychiatric disorders. (Tr. 584). Based on the colonoscopy results, Dr. Nissing recommended that Claimant follow a high fiber diet and take Ultram and Levsin for irritable bowel syndrome. (Tr. 585). The CT of her abdomen showed no acute upper abdominal abnormality. (Tr. 589). The x-ray of her lumbar spine resulted in a negative examination except for mild demineralization. (Tr. 593).

On January 1, 2007, Claimant sought treatment at urgent care at St. John's Mercy Medical Center for earache, sore throat, and fever. (Tr. 504). The next day, Claimant returned complaining of earache, chest pain, and headaches. (Tr. 502). Although prescribed Amoxicillin as treatment the day before, Claimant admitted to not filling the prescription. (Tr. 503). Claimant reported not going to work and requested a work note. (Tr. 503).

On January 26, 2007, Claimant sought medical treatment in the emergency room at St. Joseph Hospital for chronic bloating with abdominal pain secondary to irritable bowel syndrome and somatization disorder. (Tr. 348, 360-65). Claimant sought treatment in the emergency room inasmuch as she does not have a primary care physician. (Tr. 354). From January 27, 2007 through February 7, 2007, Claimant was hospitalized and received treatment for nausea, vomiting, abdominal pain, and diarrhea, but she refused psychotropic medication and inpatient therapy. (Tr. 348). Dr. Ahmet Guler recommended Claimant have significant psychiatric follow-up with Dr. William Wang. (Tr. 349). A treating doctor found Claimant not to be a very good historian. (Tr. 350). Claimant denied any numbness or weakness in any part of her body. (Tr. 350). Dr. Diwakaran noted Claimant has a lengthy history of exploratory operations for chronic abdominal pain. (Tr. 352). After having an esophagogastroduodenoscopry, Dr. Diwakaran started Claimant on Prilosec. (Tr. 391-92). After performing a colonoscopy, Dr. Diwakaran started Claimant on a

high fiber diet.  (Tr. 393-94).  Diagnostic imaging of her abdomen showed moderate gaseous distention of the colon with bowel gas and unremarkable obstruction series.  (Tr. 433, 439).

Dr. Huilin Li evaluated Claimant to provide a second opinion on her presentation on gastrointestinal management.  (Tr. 354).  Claimant reported working as a customer service representative for a local department store and not being "particularly happy with her work indicating that she would like to find a different job."  (Tr. 354).  Dr. Li noted that "[p]atient may have a level of anxiety exacerbating her symptoms as she talks with mother who then interjects the notion of possible organ system problems that lead to the patient requesting further diagnostic evaluation.  There is little objective evidence of any significant pathology."  (Tr. 355).  Dr. Wang evaluated Claimant for behavior disturbance due to her "difficulty with behavior, including being argumentative, threatening, claimed some staff broke the HIPPA law and threatening to sue hospital; and, also, even though the patient is in bed most of the time, when the incident happened in the hallway, she was able to walk around and became curious, therefore, she is not bed-bound." (Tr. 357).  Claimant reported no history of psychiatric treatment and feeling anxious recently due to her medical condition, lack of insurance, and job stress.  Dr. Wang noted "[r]egarding her medical issues that has significant symptoms with no underlying etiology was found."  (Tr. 357). Claimant reported working for a company for over twenty years and working some nanny jobs for extra cash.  She lost insurance a few years earlier when she lost another job.  (Tr. 357).  Dr. Wang ruled out somatoform disorder and diagnosed Claimant with anxiety disorder.  Although he discussed prescribing anxiolytics/antidepressant to reduce physical symptoms, Claimant did not want to do so and agreed to seek follow-up treatment with a psychiatrist as an outpatient.  (Tr. 358).

In the May 2, 2007 VIM treatment note, Claimant reported falling in a friend's shower on April 22, 2007 and momentarily losing consciousness. (Tr. 799-800).

On May 29, 2007, Claimant sought treatment at urgent care at St. John's Mercy Medical Center for headaches. (Tr. 500). Claimant reported falling on April 22 and having a continuous concussion since the fall. (Tr. 501).

On May 29, 2007, Claimant sought treatment in the emergency room at West Healthcare Center for a headache after a concussion on April 22 after being hit in the head with a piece of metal. (Tr. 509-10). Claimant reported Flexeril and Percocet helping her headache, but she is now out of medications. (Tr. 510). As treatment, the doctor administered two Percocet tablets and gave Claimant twenty tablets of Percocet and Valium. (Tr. 510-11, 516). The doctor diagnosed Claimant with a closed head injury and a concussion and discharged Claimant to home. (Tr. 512, 517).

On June 30, 2007, Claimant sought treatment in the emergency room at West Healthcare Center for a migraine. (Tr. 519). Claimant reported chronic headache since her head injury in April. (Tr. 520). The doctor prescribed Toradol and Robaxin. (Tr. 521). The CT of her brain revealed negative results. (Tr. 522, 533-34). The radiography of her cervical spine showed no fracture and no acute finding. (Tr. 523, 532). Claimant was discharged on July 1, 2007. (Tr. 526).

In follow-up treatment on August 22, 2007 at VIM Claimant reported severe headaches and dizziness. (Tr. 800).

On September 15, 2007, Claimant sought treatment at urgent care at St. John's Mercy Medical Center for stomach, fever, and back pain. (Tr. 498).

In a follow-up visit on October 31, 2007 to VIM Claimant reported headaches, blurred vision, and lower back pain. (Tr. 802).

Claimant reported having palpitations and chest pains on December 2, 2007 and was admitted via the emergency room at St. Joseph Health Center. (Tr. 280, 292). From December 2, 2007 through December 5, 2007, Claimant was hospitalized at St. Joseph Health Center and received treatment for multiple complaints following a fall in a shower. (Tr. 292). Prior to the fall, Claimant reportedly was well but since the fall, Claimant has had numerous medical complaints with posterior cervical pain being the predominant one. (Tr. 292). The doctor at St. Joseph Health Center noted that Claimant does not have a primary care physician and to be a somewhat poor historian. (Tr. 280, 284). Claimant denied any bowel or bladder dysfunction. (Tr. 292). The doctor diagnosed Claimant with cervicalgia, tension headache, hypochondriasis, asthma, and antisocial disorder. (Tr. 281). The doctor noted that after completing a stress echocardiogram showing negative results, Claimant continued to complain of palpitations and became adamant that the staff had not adequately evaluated her chronic conditions when she learned she would be discharged, (Tr. 282). Claimant threatened to call the directors of the hospital. Claimant had further evaluation including a chest CT and an MRI of her brain and cervical spine and an evaluation by a neurosurgeon. (Tr. 282, 292). Examination showed Claimant to be anxious but not in acute distress. (Tr. 284). Examination of her cervical spine revealed no tenderness and a good range of motion. (Tr. 293).

Claimant's mother expressed concern about Claimant returning home and asked for an evaluation for possible involuntary commitment. (Tr. 282). Dr. Wang of psychiatry evaluated Claimant and found her to be manipulative with a personality disorder with additional depression

and hypochondriasis and found Claimant did not meet any criteria for inpatient hospitalization. Claimant still continued to complain of headaches, and neck, back, and chest pain, but the multiple studies showed nothing life threatening or intervenable and therefore the doctor found Claimant stable for discharge. The doctor gave Claimant a wheeled walker to use as needed. (Tr. 282). Dr. Wang found Claimant to be demanding and argumentative. (Tr. 291). After a psychiatric consultation, a doctor diagnosed Claimant with depression combined with anxiety, hypochondriasis and personality disorder. (Tr. 291). Although Dr. Wang discussed possible psychiatric treatment, Claimant indicated she is not interested and wanted no follow-up treatment. (Tr. 291). A doctor prescribed Prilosec, Flexeril, and physical therapy as treatment. (Tr. 285, 287). The doctor noted that although emergency room fund could not pay for pain medications, the following medications would be covered: Flexeril, Prilosec, and Damelor. (Tr. 312).

Claimant sought treatment in the emergency room at Barnes-Jewish St. Peters Hospital on April 4, 2008 for neck and chest pain. (Tr. 676-87). Claimant was diagnosed with dysphagia. (Tr. 688).

On April 14, 2008, Claimant was admitted through the emergency room to Depaul Health Center with about a week of nausea, vomiting, and diarrhea from possible food poisoning. (Tr. 448-49). Claimant reported having some food poisoning with salmonella in the distant past. (Tr. 449). After being admitted for possible allergic reaction, Claimant indicated that she wanted "to get all the work up done in the hospital because she says she is unable to go see any specialists without insurance." (Tr. 455). Dr Hanafi found Claimant to have gastroenteritis followed by allergic reaction. (Tr. 456). Diagnostic testing of her abdomen showed no evidence of bowel obstruction. (Tr. 466). Dr. Hanafi noted Claimant did not have any diarrhea since being admitted

to the hospital and diagnosed Claimant with likely food poisoning from something she ate. (Tr. 449). In the otorhinolaryngology, Dr. Bonacorsi noted Claimant reportedly has had multiple abdominal surgeries primarily for exploration. (Tr. 451). "In the process of evaluation, she underwent a CAT scan with contrast and developed an allergic reaction with hives and some reported throat swelling." (Tr. 451). As a result, Claimant was admitted for evaluation and management. Dr. Bonacorsi found on examination that Claimant likely has foreign body sensation and sore throat associated with most likely laryngopharyngeal reflux exacerbated by her recent nausea and vomiting. (Tr. 451). Her discharge diagnosis listed probable food poisoning, multiple complaints of abdominal pain, difficulty swallowing, and history of asthma. (Tr. 453). After being administered Dilaudid in the emergency room, she developed possible allergic reaction and was admitted for further monitoring. During the hospitalization, Claimant lodged complaints of choking, having abdominal pain, falling and hitting her head though no one witnessed this event, and having diarrhea but she could not provide a stool sample. The discharging doctor noted Claimant was given a course of antibiotics on her own insistence. (Tr. 453).

On June 29, 2008, Claimant reported having chest pain for the last three days in the emergency room at St. Joseph Hospital of Kirkwood. (Tr. 702). The treatment notes indicates Claimant had been evaluated for bipolar disorder, chest pain of GI origin, and anxiety. (Tr. 715).

On July 22, 2008, Claimant sought treatment at urgent care at St. John's Mercy Medical Center for nausea, and stomach and back pain. (Tr. 496).

On July 25, 2008, Claimant sought treatment in the emergency room at St. Joseph Hospital West for abdominal pain "which she initially states is new and worsening for several days, but when further questioned seems likely it may be recurrent/chronic as she says 'before

when it's like this' and begins expressing symptoms of leg tingling, epigastric and back discomfort." (Tr. 541). The lab work revealed normal results. (Tr. 544). The CT scan obtained showed no significant intrabdominal findings. The doctor diagnosed Claimant with abdominal pain, epigastric and stomach function. (Tr. 544). The CT of her abdomen showed an unremarkable abdomen without significant pain. (Tr. 546).

On August 19, 2008, Claimant sought treatment in the emergency room at St. John's Mercy Medical Center for a cough and vomiting. (Tr. 472, 1076). Claimant was diagnosed with bronchitis and given Prednisone, Zithromax, and Percocet as treatment. (Tr. 483-86, 1086-90).

On September 28, 2008, Claimant received treatment in the emergency room at Barnes-Jewish St. Peter's Hospital for abdominal pain. (Tr. 599-612, 694-97). The radiology report showed no acute changes in abdomen. (Tr. 602, 612).

On November 20, 2008, Claimant sought treatment in the emergency room at West Healthcare Center complaining of chest pain. (Tr. 507).

From November 21 through November 24, 2008, Claimant was hospitalized at Barnes-Jewish St. Peter's Hospital and treated for abdominal pain, gastroenteritis, e-coli, and urinary tract infection. (Tr. 613-14). Claimant reported increased stress due to her living situation with her mother, but she denied any crying spells or depression at that time. (Tr. 616). The doctor started Claimant on Trazodone for her depression. (Tr. 617). He opined that Claimant "may have some drug seeking tendencies and some somatization disorder. At her last hospitalization, the patient had multiple unusual behaviors including faking falling down which she was observed by staff to sit down on the ground and then tell everyone that she had fallen and needed help."

(Tr. 617). The doctor noted that Claimant's depression and possible somatization play a strong part in her underlying medical issues. (Tr. 617-18).

On December 3, 2008, Claimant sought treatment in the emergency room at Barnes-Jewish St. Peters Hospital for nausea, vomiting, and diarrhea. (Tr. 636). The doctor diagnosed Claimant with gastroenteritis and diarrhea. (Tr. 642, 644).

Claimant received treatment during hospitalization at St. Joseph Hospital West from January 8 through January16, 2009 after being admitted in the emergency room for chest pain. (Tr. 550). The chest pain started on December 24 and gradually increased. (Tr. 550). The doctor started an IV to hydrate Claimant and gave her a Dilaudid for pain. (Tr. 552). Claimant requested admission inasmuch as she would not be able to tolerate the pain. Her diagnosis included chest pain and acute pancreatitis. (Tr. 552). The doctor noted that Claimant has had multiple hospital admissions in the past. (Tr. 553). Claimant reported abdomen pain increases with eating, and pain medications alleviate the pain. (Tr. 557). The doctor suggested Claimant follow a low fat diet. (Tr. 562). In the discharge summary, the doctor noted Claimant asked "for a lot of unnecessary tests to be run like venous Dopplers, CAT scans, x-rays, and demanding narcotics." (Tr. 564). Her discharge diagnosis included mild acute pancreatisis, chronic constipation, and irritable bowel syndrome. (Tr. 565). The imaging results showed no evidence of pancreatic inflammatory process, no obstruction of bowel, and no obstructive bowel gas pattern. (Tr. 566-69). The EGD showed the entire esophagus appeared to be normal, and mildly erythemetous mucosa found in the antrum. (Tr. 577). The doctor recommended that Claimant avoid aspirin and NSAIDS. (Tr. 577).

On January 30, 2009, Claimant reported abdominal pain, diarrhea, and fever. (Tr. 657). Her diagnosis was gastritis, and the emergency room doctor prescribed twenty Vicodin tablets (Tr. 660, 664).

On April 5, 2009, Claimant reported having chest pain and shortness of breath to the doctor at urgent care. (Tr. 1062). Claimant was transferred by ambulance to the emergency room due to acute chest pain. (Tr. 1066).

On May 4, 2009, Dr. James Greenwald, Ph.D., evaluated Claimant on referral by disability determinations. (Tr. 725). Claimant reported not taking prescription medications due to lack of insurance. (Tr. 725). Although he noted that Claimant could sit or stand no more than fifteen minutes at a time, Dr. Greenwald found that Claimant did not have any limitations in her muscle strength or her ability to move about. Examination showed her back and neck pain to be relatively normal with a decreased range of motion of her lumbar spine. (Tr. 727). Dr. Greenwald noted that Claimant was last seen in the emergency room for shortness of breath in 2007, and she has an inhaler. (Tr. 725).

Dr. Lynn Mades, Ph.D., completed an evaluation on May 4, 2009 on referral by disability determinations. (Tr. 739). Claimant's only current medication is Albuterol. (Tr. 740). Claimant listed her daily activities to include household chores such as light housework, sweeping and vacuuming, and watching television. (Tr. 742). Claimant reported that she can drive and take care of her personal needs. (Tr. 742). Dr. Mades found Claimant to have psychosocial and environmental problems and assessed her GAF to be 70. (Tr. 743). Dr. Mades noted that there appears to be somatoform disorder with multiple references in her records to symptoms that are unsubstantiated by objective evidence, and psychiatric treatment to have been limited. (Tr. 743).

In the Physical Residual Functional Capacity Assessment dated May 16, 2009, Micka Powell, a counselor, listed asthma as Claimant's primary diagnosis and irritable bowel syndrome as Claimant's secondary diagnosis. (Tr. 731). She found no exertional, postural, environmental, or visual limitations established, (Tr. 732-35). Ms. Powell found Claimant's alleged symptoms to be partially credible "as it is reasonable that she have some activity restrictions due to her history and diagnosis of asthma, migraine headaches, IBS and neck and back pain." (Tr. 736).

In the Psychiatric Review Technique completed by Dr. Kyle DeVore on May 21, 2009, he found Claimant impairments to be non-severe, and her condition does not severely restrict her ability to perform work-related activities. (Tr. 744-55).

On July 12, 2009, Claimant received treatment in the emergency room at Barnes-Jewish St. Peters Hospital for temporomandibular joint ("TMJ") syndrome and headaches. (Tr. 774-78).

On August 8, 2009, Claimant received treatment in the emergency room at Barnes-Jewish St. Peters Hospital for chest pain. (Tr. 829). Claimant reported while walking in Wal-Mart, she started having left arm pain and nausea. (Tr. 830). A continuous cardiac monitor was placed on Claimant. (Tr. 837). In the discharge summary, the attending doctor listed chest pain, depression, somatization disorder, anxiety, asthma, and migraine headaches as Claimant's diagnoses. (Tr. 864). The doctor noted Claimant has a history of somatization disorder and how she had similar symptoms in the past and undergone extensive work-up including a stress Dobutamine echo approximately four months earlier showing normal results. The stress thallium testing showed negative results. Claimant instructed to follow-up with primary care physician. The doctor further noted that during the course of the hospitalization, Claimant complained of multiple other issues including headaches, stomach pains, leg pains, back pains, and a myriad of

other issues.  The patient was reassured that none of her alleged issues were acute and did not require further evaluation.  The doctor noted that Claimant has had two negative stress tests in the last six months.  (Tr. 864).

In the cardiology consultation note, the doctor noted how upon admission to the emergency room, Claimant was given sublingual Nitroglycerin without changing her pain.  (Tr. 866).  Her symptoms improved once she was given narcotics.  Claimant reported knowing her body and can tell something is wrong, most likely a blood clot in her stomach.  (Tr. 866).  Examination showed Claimant to wonder upon questioning with a plethora of complaints that are unrelated to the questions that are asked.  (Tr. 867).  The doctor found Claimant to have atypical chest pain, most likely non-cardiac in origin and multiple somatization complaints.  (Tr. 867-68).  Dr. Zia found that Claimant's pain is in the epigastric area consistent with a burning sensation.  (Tr. 870).  Claimant also reported being concerned about her gallbladder, pancreatitis, and tumors in her head.  (Tr. 870).  The ECG showed negative results.  (Tr. 871).

On September 1, 2009, Claimant reported abdominal pain to the doctor in the emergency room at Barnes-Jewish St. Peters Hospital.  (Tr. 806-28).

On September 21, 2009, Claimant reported having abdominal pain to the emergency room doctor at St. Johns Mercy Medical.  (Tr. 1035).  Claimant was diagnosed with irritable bowel syndrome and endometriosis.  (Tr. 1039).

On September 29, 2009, Claimant reported chest pain and shortness of breath to the emergency room doctor at West Healthcare Center.  (Tr. 886, 889).  Claimant was diagnosed with chest pain and bronchitis.  (Tr. 894).  Claimant was admitted for further evaluation and treatment.  (Tr. 898).  Dr. Holzum assessed Claimant with gastroesophageal reflux disease and

atypical chest discomfort, a chronic issue, likely related to her somatization disorder. (Tr. 899). In the cardiology consultation, Claimant reported being under significant financial stress. (Tr. 900). Dr. Schwarze noted in the impression section that Claimant's complaints are "hugely somatic and I suspect anxiety plays a huge role." (Tr. 901). He recommended not repeating a cardiac stress test inasmuch as she just had one done in August, and it was negative. Dr. Schwarze recommended a GI work up and an urine culture and if her work-up is negative, he "would consider an antianxiety medication since she is extremely stressed about being unemployed and loss of income." (Tr. 901). In the GI consultation, Dr. Marc Bernstein noted Claimant has had at least nine emergency room visits in the last year. (Tr. 903). Dr. Bernstein opined that he suspects a component of somatization based on her psychiatric history and her extensive medical attention history. (Tr. 904). When asked if she has a primary care doctor, Claimant indicate that she does not like to go to doctors even though she has had multiple emergency room visits. Dr. Bernstein scheduled an upper endoscopy to rule out reflux disease and peptic ulcer disease. (Tr. 904). The abdominal pelvic CT showed no evidence of bowel obstruction and otherwise unremarkable CT evaluation. (Tr. 918).

On November 5, 2009, Claimant sought treatment in the emergency room at West Healthcare Center for chest pain and facial numbness. (Tr. 929). In the history of present illness, Dr. Leo Hsu noted how during her last hospitalization, Claimant's pain was thought to be 3/3 somatization. (Tr. 930). Dr. Hsu noted that although Claimant reported having only one head CT for her headaches several years ago, the medical record shows that she has had at least five CTs between November 16, 2006 and November 20, 2008 as well as a neurological evaluation. (Tr. 934).

On January 21, 2010, Claimant reported having chest pain to Dr. Niemann-Royer, the emergency room doctor at West Healthcare Center. (Tr. 948). Dr. Niemann-Royer noted how Claimant has a long history of chest pain and multiple cardiology evaluations in the past five years, and her symptoms are identical to previous episodes. (Tr. 949). Dr. Niemann-Royer diagnosed Claimant with chest pain, non cardiac and noted how Claimant has been complaining of identical pain for several years and has been diagnosed with a Somatization disorder. (Tr. 954-55).

On January 28, 2010, Claimant received treatment in the emergency room at SSM Health Care for dizziness, syncope, vertigo, and chest pain. (Tr. 780-90, 1006, 1009). Claimant reported being recently laid off from work at Verizon where she worked in customer service. (Tr. 1006). Included in her discharge medications was twenty tablets of oxycodone. (Tr. 780). Dr. Chahoud evaluated Claimant and noted this to be the third hospital/emergency room visit by Claimant reporting multiple complaints which are non-specific, mainly consisting of headaches, dizziness, vertigo, and facial numbness. (Tr. 1014). Dr. Jawaid evaluated her abdominal pain. (Tr. 1018). Claimant reported not taking her gastritis due to loss of insurance after recently losing her job. (Tr. 1018). Dr. Jawaid restarted Claimant's medications. (Tr. 1023). The stress and tests showed normal results, and a CT of her head was negative. (Tr. 1023, 1027).

On February 4, 2010, Claimant reported multiple complaints to the emergency room doctor at St. Johns Mercy Medical. (Tr. 1050). The doctor noted that these symptoms "have all been worked up in prior ER and hospital visits, most recently in the past week." (Tr. 1050). Claimant reported being dizzy and nausea in the disability office and passed out. (Tr. 1050). Claimant refused to drink the gi cocktail and seen laughing with family member. (Tr. 1055).

On February 21, 2010, Claimant received treatment in the emergency room at St. Joseph Hospital West after falling down steps. (Tr. 990). The emergency room nurse noted Claimant to be aggressive and argumentative with the staff and requesting more pain medication. (Tr. 999). Her sister reported how Claimant is often aggressive, rude, and difficult to handle and has psychological issues but she refuses to see a psychiatrist. (Tr. 999).

On February 23, 2010, Claimant reported having shortness of breath and lower back pain to Dr. Fouts, the emergency room doctor at West Healthcare Center. (Tr. 965). Claimant reported falling down steps a couple of days earlier and being seen at St. Joseph West that evening. (Tr. 965). A CT of her brain showed no acute intracranial abnormality, and no fractures identified. (Tr. 968-69). Dr. Fouts diagnosed Claimant with lumbosacrail strain. (Tr. 975).

On March 11, 2010, Claimant reported having abdominal pain to Dr. Ahlborn, the emergency room doctor at St. Joseph Hospital West. (Tr. 979). Examination showed abdominal tenderness. (Tr. 981). Dr. Ahlborn found Claimant to have abdominal pain and a closed fracture of a rib and prescribed hydrocodone and other medications as treatment. (Tr. 981-82).

On March 30, 2010, Claimant reported having abdominal pain, shortness of breath, chest pain, and diarrhea to Dr. Peter Gardiner, the emergency room doctor at Barnes-Jewish St. Peter's Hospital. (Tr. 1104-05). A nurse observed Claimant did not have any objective signs of pain. (Tr. 1116). Claimant's diagnosis included reflux esophagitis, asthma attack, constipation, and dizziness. Dr. Gardiner directed Claimant to seek follow-up treatment at Volunteers in Medicine Clinic and provided a medication regimen. (Tr. 1116).

On April 19, 2010, Dr. David Lipsitz, Ph.D, completed a psychological consultation of Claimant on referral by her attorney.  (Tr. 1157).  Claimant drove herself to the consultation.  Dr. Lipsitz noted Claimant to be the informant, and her reliability to be somewhat questionable.  Claimant reported "I'm not able to work.  I've had one job I loved for 18 years, but in my 17th year there I had a sexual harassment claim which made me have a lot of anxiety, depression, and stress."  (Tr. 1157).  Claimant reported having back surgery in 2007 after a fall in the shower at a friend's house.  (Tr. 1158).  Claimant reported having seen Dr. Khojasteh, a psychiatrist, for treatment.[4]  (Tr. 1158).  Dr. Lipsitz opined that based on the results from intellectual testing, Claimant is currently functioning within the mentally retarded range, and she is unable to focus, concentrate, stay on task, and use her cognitive abilities as she once could due to significant decompensation and deterioration of intellectual functioning due likely to her severe psychiatric disturbance.  (Tr. 1160).  Dr. Lipsitz diagnosed Claimant with bipolar disorder with anxiety attacks, somatiform disorder, mild mental retardation, and occupational problems with social environment.  Dr. Lipsitz opined that Claimant is in need of ongoing psychiatric treatment.  (Tr. 1160).  In the Medical Assessment of Ability to do Work-Related Activities, Dr. Lipsitz found Claimant to have poor/none ability to make occupational adjustments and fair/poor/none  ability to make performance adjustments.  (Tr. 1161-62).

On May 2, 2010, Claimant reported experiencing chest pain and shortness of breath to the emergency room doctor at St. Joseph Hospital West.  (Tr. 1142).  The doctor diagnosed Claimant with chest pain and prescribed medications as treatment.  (Tr. 1149).

---

[4]The undersigned notes that the medical record does not contain any treatment notes from Dr. Khojasteh.

**IV.    The ALJ's Decision**

The ALJ found that Claimant meets the insured status requirements of the Social Security Act through March 31, 2010.  (Tr. 13).  Claimant has not engaged in substantial gainful activity since February 14, 2007, the alleged onset date.  (Tr. 13).  The ALJ found that the medical evidence establishes that Claimant had the following severe impairments: mild asthma, obesity, irritable bowel syndrome, headaches, somatoform disorder, personality disorder, and major depressive disorder.  (Tr. 13-14).  The ALJ opined that Claimant has the residual functional capacity to perform light work.  (Tr. 15).  The ALJ found that Claimant can occasionally climb ramps and stairs, stoop, kneel, crouch and crawl but cannot climb ropes, ladders, or scaffolds. Claimant must avoid concentrated exposure to fumes, odors, dust and gases as well as unprotected heights.  She can understand, remember and carry out simple to moderately complex instructions and can adapt to routine work changes.  (Tr. 15).  The ALJ further found Claimant can take appropriate precautions to avoid hazards, and she should not work in a setting which includes constant or regular contact with the general public.  (Tr. 15-16).  The ALJ found that Claimant is unable to perform any past relevant work as a customer service representative and a women's clothing salesclerk inasmuch as this work requires the performance of work-related activities precluded by her RFC due to the amount of contact with the general public.  (Tr. 17).

The ALJ found Claimant was born on May 17, 1962, and was forty-four years old which is defined as a younger individual age 18-49, on the alleged disability onset date.  The ALJ noted Claimant has a high school education and is able to communicate in English.  The ALJ noted that the transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules supports a finding that Claimant is not disabled whether or not

Claimant has transferable job skills. (Tr. 17). Considering Claimant's age, education, work experience, and residual functional capacity, the ALJ opined there are other jobs that exist in significant numbers in the national economy that Claimant can perform including housekeeper/cleaner and light hand packager work. (Tr. 17-18). The ALJ concluded that Claimant was not under a disability from February 14, 2007, through the date of this decision. (Tr. 18).

## V.    Discussion

In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which

asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will

affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The claimant's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the claimant's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "if it is supported by substantial evidence on the record as a whole." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence,

however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. Id. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ erred in formulating the RFC by failing to include additional limitations such as frequent work absences, hospitalizations, and trips to the emergency room. Claimant further contends that the ALJ erred in determining Claimant's credibility.

A.    Residual Functional Capacity and Credibility Determination

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ erred in formulating the RFC by failing to include additional limitations such as frequent work absences, hospitalizations, and trips to the emergency room.

With regard to the ALJ's determination of Claimant's RFC, the undersigned finds that the ALJ properly assessed the medical evidence and Claimant's credibility. "The ALJ must determine a claimant's RFC based on all of the relevant evidence." Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004). It is the responsibility of the ALJ to assess a claimant's RFC based on all the evidence, including medical records, the opinions of treating and examining physicians, as well as

the claimant's own statements regarding his limitations. McGeorge v. Barnhart, 321 F.3d 766, 768 (8th Cir. 2003); McKinney v. Apfel, 228 F.3d 860 863 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). "In analyzing the evidence, it is necessary to draw meaningful inferences and allow reasonable conclusions about the individuals's strengths and weaknesses." SSR 85-16. SSR 85-16 further delineates that "consideration should be given to ... the [q]uality of daily activities ... [and the a]bility to sustain activities, interests, and relate to others *over a period of time*" and that the "frequency, appropriateness, and independence of the activities must also be considered." SSR 85-16.

An ALJ must begin his assessment of a claimant's RFC with an evaluation of the credibility of the claimant and assessing the claimant's credibility is primarily the ALJ's function. See Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003) (finding a claimant's credibility is primarily a matter for the ALJ to decide); Pearsall, 274 F.3d at 1218. In making a credibility determination, an ALJ may discount subjective complaints if they are inconsistent with the record as a whole. Holstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). In Polaski, the Eighth Circuit set out factors for an ALJ to consider when determining the credibility of a claimant's subjective complaints. The ALJ must make express credibility determinations detailing the inconsistencies in the record that support the discrediting of the claimant's subjective complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). "An ALJ must do more than rely on the mere invocation of Polaski to insure safe passage for his or her decision through the course of appellate review." Harris v. Shalala, 45 F.3d 1190. 1193 (8th Cir. 1995). However, the Eighth Circuit has held that an ALJ is not required

to discuss each Polaski factor methodically.  The ALJ's analysis will be accepted as long as the opinion reflects acknowledgment and consideration of the factors before discounting the claimant's subjective complaints.  Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).  See also Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996).  An ALJ is only required to consider impairments he finds credible and supported by substantial evidence in determining a claimant's RFC.  See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) ("The ALJ properly limited his RFC determination to only the impairments and limitations he found to be credible based on his evaluations of the entire record." )

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).  Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by some medical evidence.  See Lauer, 245 F.3d at 704.

The determination of Claimant's credibility is for the Commissioner, and not the Court, to decide.  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  The ALJ may not discredit Claimant's complaints of pain solely because they are unsupported by objective medical evidence.

O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003); Jones v. Chater, 86 F.3d 823, 826 (8th

Cir. 1996); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted).

Instead, the ALJ must fully consider all of the evidence relating to the subjective complaints,

including the Claimant's work record, the absence of objective medical evidence to support the

complaints, and third party observations including treating and examining doctors as to:

1.     claimant's daily activities;

2.     duration, frequency and intensity of the pain;

3.     precipitating and aggravating factors;

4.     dosage, effectiveness and side effects of medication;

5.     functional restrictions.

Ford v. Astrue, 518 F.3d 979, 982 (8th Cir. 2008) (citing Polaski v. Heckler, 739 F.2d 1320,

1322 (8th Cir. 1984)).  The ALJ may disbelieve the claimant's subjective complaints "if there are

inconsistencies in the evidence as a whole."  Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th

Cir. 2004).

     When determining a claimant's complaints of pain, the ALJ may disbelieve such

complaints if there are inconsistencies in the evidence as a whole.  Polaski, 739 F.2d at 1322. The

ALJ must make express credibility determinations detailing the inconsistencies in the record that

support the discrediting of the claimant's subjective complaints.  Singh v. Apfel, 222 F.3d 448,

452 (8th Cir. 2000); see also Johnson v. Secretary of Health and Human Servs., 872 F.2d 810,

813 (8th Cir. 1989).  "An ALJ must do more than rely on the mere invocation of Polaski to insure

safe passage for his or her decision through the course of appellate review."  Harris v. Shalala, 45

F.3d 1190, 1193 (8th Cir. 1995).  Where an ALJ explicitly considers the Polaski factors but then

discredits a claimant's complaints for good reason, his decision should be upheld. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). However, the Eighth Circuit has held that an ALJ is not required to discuss each Polaski factor methodically. Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1966). The ALJ's analysis will be accepted as long as the opinion reflects acknowledgment and consideration of the factors before discounting the claimant's subjective complaints. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000); see also Brown, 87 F.3d at 966. The ALJ's credibility findings are entitled to deference if the findings are supported by multiple valid reasons. See Goff v. Barnhart, 421 F.3d 785, 791-92 (8th Cir. 2005); Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003) (if ALJ explicitly discredits claimant and gives good reasons for doing so, court will normally defer to credibility determination). The undersigned finds that the ALJ's credibility determination is supported by substantial evidence.

In his decision the ALJ thoroughly discussed the medical treatment and evidence, hearing testimony, the lack of medical evidence corroborating Claimant's subjective complaints of functional limitations and pain, the ALJ's observations at the hearing, and the medical opinions in the record. See Gray v. Apfel, 192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities). The lack of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995) (lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994) (the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints

was an important factor in evaluating the credibility of her testimony and of her complaints). The ALJ noted that although Claimant asserts that she is unable to work due to multiple symptoms, the clinical and objective medical findings are inconsistent with an individual experiencing totally debilitating symptomatology. In support, the ALJ cited to the treatment notes from the emergency room visits and the findings of the state agency medical consultants, Dr. Greenwald and Dr. Mades and the limited, conservative medical treatment. The ALJ then addressed other inconsistencies in the record to support his conclusion that Claimant's complaints were not credible.

Specifically, the ALJ noted that no treating physician in any treatment notes found Claimant to be disabled or unable to work or imposed mental limitations on Claimant's capacity for work during the relevant time period. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints). The lack of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. See Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012); Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995) (lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994) (the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints).

In the review systems, Dr. Nissing noted "[d]ifficult to accurately assess as virtually any question brings out a positive symptom." As noted by the ALJ, on January 28, 2010, Dr. Chahoud evaluated Claimant and noted this to be the third hospital/emergency room visit by Claimant reporting multiple complaints which are non-specific, mainly consisting of headaches, dizziness, vertigo, and facial numbness. The stress and tests showed normal results, and a CT of her head was negative. In another emergency room visit, Claimant continued to complain of headache, and neck, back, and chest pain, but the multiple studies showed nothing life threatening or intervenable and therefore the doctor found Claimant stable for discharge. The doctor further noted that during the course of the hospitalization, Claimant complained of multiple other issues including headaches, stomach pains, leg pains, back pains, and a myriad of other issues. The patient was reassured that none of her alleged issues were acute and did not require further evaluation. In addition, the ALJ noted that no physician had ever made any medically necessary restrictions, restrictions on her daily activities, or functional or physical limitations. Likewise, the medical evidence is devoid of any evidence showing that Claimant's condition has deteriorated or required aggressive medical treatment. Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care is not suggestive of disabling pain); Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993) (lack of ongoing treatment is inconsistent with complaints of disabling condition). Thus the ALJ found that the medical record undermines Claimant's credibility concerning her allegations of disabling pain and disabling impairments. Edwards v. Barnhart, 314 F.3d 964, 968 (8th Cir. 2003) (claimant's failure to pursue regular

medical treatment detracted from credibility.).  Further, the record does not establish that

Claimant did not receive medical treatment because of limited resources.[5]

Likewise, the ALJ noted that Claimant never sought nor received any form of treatment

from a mental health specialist although such treatment had been recommended by a number of

doctors.[6]  See Page v. Astrue, 484 F.3d 1040, 1044 (8th Cir. 2007) (affirming ALJ's

determination that mental health issues were not severe where claimant sought very limited

treatment).  Indeed, on a number of occasions during treatment, doctors recommended Claimant

have a psychiatric evaluation. Although Dr. Wang discussed prescribing anxiolytics/antidepressant

to reduce physical symptoms and possible psychiatric treatment, Claimant did not want to do so

------

[5]Although Claimant claimed that she failed to undergo testing and be treated by a primary care physician or a mental health specialist, there is no indication that she ever attempted to receive treatment and was refused due to lack of funds. The record is devoid of evidence suggesting that Claimant was denied treatment offered to indigents.  See Nelson v. Sullivan, 966 F.2d 363, 367 (8th Cir. 1992)(holding the mere use of nonprescription pain medication is inconsistent with complaints of disabling pain); Murphy v. Sullivan, 953 F.2d 383, 386-87 (8th Cir. 1992)(finding it is inconsistent with the degree of pain and disability asserted where no evidence exists that claimant attempted to find any low cost medical treatment for alleged pain and disability).  Except for the notations in the treatment notes, the record does not document that Claimant was ever refused treatment due to insufficient funds.  See Osborne v. Barnhart, 316 F.3d 809, 812 (8th Cir. 2003) (recognizing that a lack of funds may justify a failure to receive medical care; however, a plaintiff's case is buttressed by evidence he related of an inability to afford prescriptions and denial of the medication); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999); Murphy, 953 F.2d at 386 (If a claimant is unable to follow a prescribed regimen of medication and therapy to combat his difficulties because of financial hardship, that hardship may be taken into consideration when determining whether to award benefits).  The fact that a claimant is under financial strain, however, is not determinative.  Id.  Here, as the ALJ points out, the record is devoid of any credible evidence showing that Claimant was denied treatment due to lack of finances and thus inferred that Claimant did not seek more frequent medical treatment more often, because she did not have a medical need for such treatment.  Case law permits the ALJ's reasonable inferences. See Pearsall v. Massanari, 274 F.3d at 1218.  Likewise, the record is devoid of any evidence showing that Claimant had been denied medical treatment or access to prescription pain medications on account of financial constraints.  See Clark v. Shalala, 28 F.3d 828, 831 n.4 (8th Cir. 1994).

[6]Although Claimant reported having seen Dr. Khojasteh, a psychiatrist, for treatment, the record does not contain any treatment notes from Dr. Khojasteh.

and agreed to seek follow-up treatment with a psychiatrist as an outpatient but the record shows she did not seek follow-up treatment. During evaluation, Dr. Wang found Claimant to be manipulative with a personality disorder with additional depression and hypochondriasis. The fact that Claimant did not seek aggressive treatment from a mental health professional was a proper consideration. See Partee v. Astrue, 638 F.3d 860, 864 (8th Cir. 2011) (holding that the failure to seek mental treatment is a relevant consideration when evaluating a claimant's mental impairment); Kirby v. Astrue, 500 F.3d 705, 708-09 (8th Cir. 2007) (affirming ALJ's finding that claimant did not suffer significant impairment due to psychiatric illness when claimant had never had any formal treatment by psychiatrist, psychologist, or other mental health professional on a long-term basis); Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (affirming the ALJ's conclusion that mental impairments were not disabling when there was no evidence "of ongoing counseling of psychiatric treatment or of deterioration of change in [claimant's] mental capabilities"); Jones v. Callahan, 122 F.3d 1148, 1153 (8th Cir. 1987) (affirming ALJ's finding that claimant's mental impairment was not severe based on, inter alia, lack of any regular treatment by mental health professional, although claimant "might experience some difficulties associated with his mental or emotional health."); Vanlue v. Astrue, 2012 WL 4464797, at *12 (E.D. Mo. Sept. 26, 2012) (affirming the ALJ's finding that depression was not a severe impairment where the claimant had sought only minimal

and conservative treatment and the claimant never required more aggressive forms of mental health treatment than medication).

The ALJ further cited the reports from the consultative doctors who examined Claimant as part of her application for disability benefits. Although Dr. Greenwald noted that Claimant could

sit or stand no more than fifteen minutes at a time, he found that Claimant did not have any limitations in her muscle strength or her ability to move about. During her evaluation by Dr. Mades, Claimant listed her daily activities to include household chores such as light housework, sweeping and vacuuming, and watching television, and she reported being able to drive and to take care of her personal needs. Dr. Mades noted that there appears to be somatoform disorder with multiple references in her records to symptoms that are unsubstantiated by objective evidence, and psychiatric treatment to have been limited.

The ALJ also discussed Claimant's activities of daily living showing Claimant has a mild restriction. The ALJ noted how the evidence of record established Claimant has no problems with self care, able to prepare meals daily and do light cleaning and laundry, and walking her dog. The ALJ found Claimant to be able to pay her bills and handle a bank account when she has money. It is permissible for the ALJ to consider a claimant's activities of daily living. Cf. Clevenger v. Astrue, 567 F.3d 971, 976 (8th Cir. 2009) ("Our cases admittedly send mixed signals about the significance of a claimant's daily activities in evaluating claims of disabling pain, but [claimant] did report that she engaged in an array of such activities - including doing laundry, washing dishes, changing sheets, ironing, preparing meals, driving, attending church, and visiting friends and relatives - and it was not unreasonable ... for the ALJ to rely on this evidence to infer that [claimant's] assertion of disabling pain was not entirely credible.").

The ALJ considered her presentation during the hearing appeared to be very dramatic and exaggerated. (Tr. 17). While an ALJ cannot accept or reject subjective complaints solely on the basis of personal observations, an ALJ's observations of a claimant's appearance and demeanor during the hearing is a consideration. Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) (holding

- 36 -

that the ALJ "is in the best position" to assess credibility because he is able to observe a claimant during his testimony); Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001) ("The ALJ's personal observations of the claimant's demeanor during the hearing [are] completely proper in making credibility determinations."); See Lamp v.Astrue, 531 F.3d 629, 632-33 (8th Cir. 2008) (holding that in assessing the plaintiff's allegations of lack of concentration, an impaired memory, and depression, the ALJ properly combined his review of the record with his personal observations); Flynn v. Astrue, 513 F.3d 788, 794 (8th Cir. 2008) (same with respect to the ALJ's observation, in assessing the plaintiff's physical RFC, that the plaintiff was able to sit through the one-hour hearing.); Jones v. Callahan, 122 F.3d 1148, 1151 (8th Cir. 1997) ("When an individual's subjective complaints of pain are not fully supported by the medical evidence in the record, the ALJ may not, based solely on his personal observations, reject the complaints as incredible."). See also Smith v. Shalala, 987 F.2d 1371, 1375 (8th Cir. 1993) (observation by the ALJ that claimant had not appeared uncomfortable at the hearing was properly considered as detracting from claimant's credibility). Here, the ALJ combined his review of the record as a whole with his personal observations. As such, the Court finds that the ALJ's decision in this regard is based on substantial evidence.

Further, the ALJ evaluated other inconsistencies in the record including Claimant's contradictory testimony regarding the reasons for and frequency of her emergency room visits. The ALJ also noted Claimant had a "litany of excuses for not seeking mental health treatment, based on nothing more than reports that she claimed to have heard from her friends regarding therapy and the possibility of addiction to certain types of medication." (Tr. 17).

The undersigned disagrees with Claimant's argument that it was unfair for the ALJ to cite her failure to seek mental health treatment as weighing against her credibility. As noted by the ALJ, the record shows there are reasons other than her mental impairments for her ongoing failure to comply with the prescribed course of treatment including seeking mental health care treatment the doctors repeatedly recommended. There is no record evidence that doctors attributed her depression to her noncompliance. The record evidence shows that her noncompliance was related to her choice not to seek the treatment. Indeed, during the hearing, Claimant changed her testimony regarding why she did not seek mental health care and admitted being aware of how her emotional state impacted her body and physical problems. Further, none of the examining doctors suggested that her depression rendered her incapable of understanding the implications of her noncompliance. Cf., Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2009) (no evidence "expressly linking" depression and noncompliance); Pate-Fires v. Astrue, 564 F.3d 935, 945-47 (8th Cir. 2009) (noncompliance with medications was a manifestation of schizophrenic disorder).

In his decision, the ALJ identified the Polaski factors and set out numerous inconsistencies in the record to support his conclusion that Claimant's complaints were not credible. See Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996) (failure to seek medical treatment for symptoms inconsistent with subjective complaints of pain); see also Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir. 1997) (failure to seek more aggressive treatment and lack of continuous treatment inconsistent with complaints of disabling pain).

After engaging in a proper credibility analysis, the ALJ incorporated into Claimant's RFC those impairments and restrictions found to be credible. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) (the ALJ "properly limited his RFC determination to only the

impairments and limitations he found credible based on his evaluation of the entire record."). The ALJ determined that the medical evidence supported a finding that Claimant could perform light work. In particular, the ALJ noted as follows:

> She can occasionally climb ramps and stairs, stoop, kneel, crouch and crawl but cannot climb ropes, ladders or scaffolds. She must avoid concentrated exposure to fumes, odors, dust and gases as well as to unprotected heights. She can understand, remember and carry out simple to moderately complex instructions. She can adapt to routine work changes. She can also take appropriate precautions to avoid hazards. She should not work in a setting which includes constant or regular contact with the general public.

(Tr. 15-16).

Claimant's contention that the RFC should have made allowances for her frequent work absences, hospitalizations, and trips to the emergency room and included greater limitations to account for her impairments especially her somatization disorder[7] and limited ability to stand and walk and is without merit. The ALJ found Claimant's complaints to be not fully credible. The medical evidence does not support the physical and mental limitations Claimant alleges.

---

[7]The undersigned notes that the fact that Claimant did not allege somatization disorders in her applications for disability benefits is significant, even though she submitted some medical evidence of such impairments. In her applications for disability benefits, Claimant alleged disability due to asthma, irritable bowel syndrome, anxiety, depression, neck and back injury, stomach, and migraines. The ALJ found Claimant has the severe impairments of mild asthma, obesity, irritable bowel syndrome, headaches, somatoform disorder, personality disorder, and major depressive disorder and concluded that the impairments, alone or in combination, are not of listing level. A review of Claimant's applications shows that Claimant failed to allege somatoform disorder as a basis for disability. See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (failure to allege disabling mental impairment in application is significant, even if evidence of depression was later developed). Claimant did not testify at the hearing that her somatoform disorder affects her ability to function, and the ALJ fulfilled his duty of investigating this claim not presented in the applications for benefits but for the first time raised by Claimant in her brief. The undersigned concludes that the ALJ did not err in discounting Claimant's somatoform disorder. See Kirby v. Astrue, 500 F.3d 705, 707-09 (8th Cir. 2007) (impairment is not severe if it is only slight abnormality that would not significantly limit mental ability to do basic work activities; claimant bears the burden of establishing impairment's severity).

At the hearing, Claimant testified that she needs to lie down most of the day because of dizziness and headaches. To the extent Claimant claims her activities are restricted beyond the limitations which the ALJ included in the RFC, a record, such as that in the matter under consideration, which does not reflect physician imposed restrictions suggests that a claimant's restrictions in daily activities are self-imposed rather than by medical necessity. See e.g. Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004) (whether there is a need to lie down is a medical question requiring medical evidence; record did not contain any evidence that medical condition required claimant to lie down for hours each day); See Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004) ("[T]here is no medical evidence supporting [the claimant's] claim that she needs to lie down during the day."); Fredrickson v. Barnhart, 359 F.3d 972, 977 n.2 (8th Cir. 2004) ("There is no evidence in the record that [the claimant] complained of severe pain to his physicians or that they prescribed that he elevate his foot or lie down daily."). Likewise, no doctor determined Claimant needed to lie down as a medical necessity. Thus, if Claimant was not lying down out of medical necessity, she must be doing so out of choice. See Craig v. Chater, 943 F.Supp. 1184, 1188 (W.D. Mo. 1996); Cf. Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004) (whether there is a need to lie down is a medical question requiring medical evidence; record did not contain any evidence that medical condition required claimant to lie down for hours each day).

As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied relief solely on the lack of objective medical evidence to support his finding that Claimant is not disabled. Instead, the ALJ considered all the evidence relating to Claimant's subjective complaints, including the various factors as required by Polaski, and determined Claimant's allegations not to be credible. Although the ALJ did not explicitly discuss each Polaski factor in

making his credibility determination, a reading of the decision in its entirety shows the ALJ to have acknowledged and considered the factors before discounting Claimant's subjective complaints.  See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996).  Inasmuch as the ALJ expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a whole, and the ALJ's determination is supported by substantial evidence, such determination should not be disturbed by this Court.  Id.; Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996).  Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not entirely credible, the undersigned defers to the ALJ's credibility findings.  See Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (deference given to ALJ's credibility determination when it is supported by good reasons and substantial evidence); Guilliams v. Barnhart, 393 F.3d 798, 801(8th Cir. 2005).

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before him and set out the inconsistencies detracting from Claimant's credibility.  The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole.  Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).  The ALJ pointed out inconsistencies in the record that tended to militate against the Claimant's credibility.  See Guilliams, 393 F.3d at 801 (deference to ALJ's credibility determination is warranted if it is supported by good reasons and substantial evidence).  Those included Claimant's conservative medical treatment, the lack of medical evidence corroborating Claimant's subjective complaints of functional limitations and pain, the ALJ's observations at the hearing, and the consultative medical opinions.  The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination.  See Cox v. Barnhart, 471

F.3d 902, 907 (8th Cir. 2006);   Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992).

Accordingly, the ALJ did not err in discrediting Claimant's subjective complaints.  See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001) (affirming the ALJ's decision that claimant's complaints of pain were not fully credible based on findings, inter alia, that claimant's treatment was not consistent with amount of pain described at hearing, that level of pain described by claimant varied among her medical records with different physicians, and that time between doctor's visits was not indicative of severe pain).  The undersigned finds that substantial evidence supports the ALJ's finding that the medical records do not support the extent of Claimant's subjective complaints of pain.  See Flynn v. Astrue, 513 F.3d 788, 792 (8th Cir. 2008) (standard of review; substantial evidence is enough that reasonable mind might accept it as adequate to support decision).

The ALJ opined that the medical record does not show that any physician imposed any functional restrictions of Claimant or found her to be totally disabled.  Likewise, a review of the medical record shows no doctor ever imposed any restrictions on Claimant's ability to walk, stand, or perform nonexertional tasks, and no doctor imposed any limitations on her activities. The ALJ found Claimant's complaints of pain not to be credible in light of the paucity of abnormal findings.  Indeed, the ALJ highlighted the lack of documentation in the treatment records of restrictions upon Claimant's functional capacity ever placed on Claimant.  The ALJ specifically noted that no doctor had placed any specific limitations on Claimant's abilities to do other basic exertional activities.  The ALJ also properly considered the Polaski factors in concluding that Claimant's subjective complaints of pain and discomfort are not supported by the objective medical evidence inasmuch as Claimant failed to receive consistent treatment.  The ALJ listed

facts from Claimant's hearing testimony regarding the Polaski factors and the medical record that reflected upon Claimant's ability to perform light work such as the paucity of abnormal findings and limited treatment and conservative medical treatment. Further, the ALJ pointed out other inconsistencies in the record that tended to militate against Claimant's credibility. See Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007) (finding that substantial evidence supported the ALJ's decision where there were too many inconsistencies in the case). Those included Claimant's demeanor at the hearing, the absence of objective medical evidence, the absence of any doctor finding Claimant disabled or imposing any functional limitations, her conservative medical treatment, and contradictory testimony. Based on the ALJ's analysis of the medical evidence and Claimant's credibility, the undersigned finds that there exists in the record substantial evidence to support a finding that Claimant retains an RFC to perform light work. The ALJ's determination does not contradict any of the medical evidence, and nothing else in the record detracts from his decision. Thus, the undersigned finds that substantial evidence supports the ALJ's finding that Claimant has the residual functional capacity to perform light work.

The substantial evidence on the record as a whole supports the ALJ's decision. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case

differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

B.  New Evidence Before the Appeals Council

Claimant obtained an neuropsychiatric evaluation by Dr. Ana Maria Soto on March 4, 2011 six months after the ALJ issued his decision. (Tr. 4-5, 1163-70). Records of that treatment were submitted to the Appeals Council. After the ALJ issued his decision, Claimant requested in the October 27, 2010 letter that he reopen his decision so he could consider Dr. Lipsitz's psychological consultation her counsel failed to attach to the brief. (Tr. 233). The Appeals Council stated that it had considered the additional evidence from Dr. Lipsitz and Dr. Soto and determined that it did not provide a basis for changing the ALJ's decision. (Tr. 1-6).

The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision. 20 C.F.R. § 404.970(b); Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000). Additional evidence submitted to the Appeals Council is material when it is "relevant to the claimant's condition for the time period for which benefits were denied." Lamp v. Astrue, 531 F.3d 629, 632 (8th Cir. 2008) (quoting Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000)). The newly submitted evidence becomes part of the administrative record, even though the evidence was not originally included in the ALJ's record. Cunningham, 222 F.3d at 500. This Court does not review the Appeal Council's denial but determines whether the record as a whole, including the new evidence, supports the ALJ's determination. Cunningham, 222 F.3d at 500.

The Eighth Circuit interprets a statement by the Appeals Council that additional evidence "did not provide a basis for changing the ALJ's decision" as a finding that the additional evidence

in question was not material.  Aulston v. Astrue, 277 F. App'x 663, 664 (8th Cir. 2008) (citing Bergmann, 207 F.3d at 1069-70) (noting that whether additional evidence meets criteria of materiality is a question of law that courts review de novo).

Although the Appeals Council denied Claimant's request for review without comment, records reflect that the Appeals Council received the additional records; that it made them part of the record; that it considered these records; and that it concluded that these records did not provide a basis for changing the decision of the ALJ.  (Tr. 1-6).  After careful review, the Court concludes that Dr. Soto's evaluation submitted to the Appeals Council does not relate to the period at issue and addresses Claimant's condition and document her medical treatment received after the ALJ issued his decision.  See e.g. Roberson v. Astrue, 481 F.3d 1020, 1026 (8th Cir. 2007) (finding no error in Appeals Council's decision that new records prepared seven months after ALJ's decision described claimant's condition on date records were prepared, not on earlier date, and consequently were not material).  The Regulations provide that an application is effective through the date of the ALJ's decision.  20 C.F.R. § 404.620.

The additional records support the ALJ's determination that Claimant is not disabled.  If the limitations set out in the new medical evidence indeed persist, Claimant's recourse is to file a new application for benefits, alleging an onset of disability after the date of the ALJ's decision in this case.  See Riley v. Shalala, 18 F.3d 619, 623 (8th Cir. 1994).

While there is evidence to support a contrary result, the ALJ's determination is supported by substantial evidence on the record as a whole.  "It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo."  Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (citation omitted).  "If after review, [the court] find[s]

it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits." <u>Id.</u> (quoting <u>Mapes v. Chater</u>, 82 F.3d 259, 262 (8th Cir. 1996)).  Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that  the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

Judgment shall be entered accordingly.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  12th   day of February, 2014.